UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2701
_____


LARRY NORMAN ANDERSON,

                                        Petitioner-Appellant,

                        versus

JAMES A. COLLINS, Director
Texas Department of Criminal
Justice, Institutional Division
and DAN MORALES, Attorney General
of the State of Texas

                                        Respondents-Appellees.

_____

Appeal from the United States District Court for the
            Southern District of Texas
_____

(April 1, 1994)

Before KING, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

    Plaintiff-appellant Larry Norman Anderson (Anderson), convicted in a Texas court in 1983 of capital murder and sentenced to death, challenges the district court's denial of his petition for a writ of habeas corpus. We affirm the district court's denial of habeas corpus relief.

## Facts and Proceedings Below

    At about 2:20 a.m. on March 30, 1982, Trooper Gary Stone (Stone) was on patrol in west Harris County. Having previously

received a report about a vehicle in the area driving without its lights on, Stone pulled Anderson over after he saw Anderson turn on his headlights while driving toward Stone's car. Anderson's hands and clothes were covered with blood, and in the bed of Anderson's pickup truck were an overturned garbage can containing a large amount of blood and a lock-blade knife covered with blood. Inside the cab of the truck were two money bags full of money and a ski mask. Anderson claimed that the money bags belonged to him.

Anderson was taken into custody, and at the police station later that morning was asked if he knew anything about the disappearance of Zelda Lynn Webster (Webster), a manager at a nightclub near where Anderson had been residing. Webster had been reported as missing from the club earlier in the evening. The bank bags that normally stayed behind the bar of the club were also gone.

Anderson initially declined to answer questions about Webster, but then voluntarily confessed to having killed her. He stated that he had been involved in a drug transaction with Webster, and that she had refused to pay him. On the previous evening, he indicated, he and Webster had engaged in sexual intercourse, after which she became hysterical and demanded that he return the money he had taken from her. He confessed to having stabbed her and discarded her body in a remote ditch near Addicks Dam. The police officers discovered Webster's body where Anderson told them it could be found. She had been stabbed fifteen times in the chest.

Police officers then met with Anderson's aunt, and she took them to the home of Anderson's cousin, who was away on vacation and

2

had left Anderson a set of keys so that he could look after the house. In the house, on top of Anderson's jacket, the officers found Webster's purse. Inside the purse was a bank bag filled with money. This bag, and the other two found in Anderson's pickup, were shown to belong to the lounge where Webster worked.

Anderson pleaded not guilty to capital murder, and his testimony at the guilt/innocence phase of his trial elaborated on the confession given to the police. He testified that on the evening in question he had gone to the lounge to collect five thousand dollars that Webster owed him as part of a drug deal. They argued, but she agreed to get him the money, and they then drove to his cousin's house, where they engaged in sexual intercourse. Anderson then asked Webster if she was ready to get the money. She said that she was not, and accused Anderson of raping her. She told him that if he did not leave her alone, she would call the police and have him sent to prison. He responded that he had to have the money. She started to walk toward the telephone, and he stepped in front of her.

Anderson testified that although he was upset, he and Webster agreed to go back to the lounge. On the way, Anderson convinced her to stop at his uncle's office building, where he had been staying. They went to the room where Anderson had been sleeping, and he renewed his demands for payment. Webster again refused and started walking toward a telephone in the next room. Anderson grabbed her, a fight ensued, and he stabbed her with a knife he wore on his belt. In his trial testimony, Anderson denied any knowledge of the money bags.

Anderson was convicted of capital murder under Tex. Penal Code Ann. § 19.03 on February 14, 1983. On the same day, he was sentenced to death by lethal injection after the jury answered affirmatively the three special issues submitted under former Tex. Code Crim. Proc. Ann. art. 37.071.[1] Anderson did not testify at the sentencing phase of his trial.

His direct appeal was handled by the same lawyer who handled the jury trial, attorney Joe Frank Cannon (Cannon). Also representing Anderson on appeal was attorney Kristine C. Woldy (Woldy). The Texas Court of Criminal Appeals affirmed the conviction and sentence on October 9, 1985, and the United States Supreme Court denied *certiorari* on October 6, 1986. *Anderson v. State*, 701 S.W.2d 868 (Tex. Crim. App. 1985), *cert. denied*, 107 S.Ct. 239 (1986).

Anderson, represented by attorney Richard Alley (Alley), filed applications for a writ of habeas corpus and motions for a

---

[1] At the time of Anderson's offense, the Texas capital sentencing statute required the court to sentence the defendant to death if the jury returned affirmative findings on each of the following issues:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex. Code Crim. Proc. Ann. art. 37.071(b) (Vernon 1981).

4

stay of execution in both the trial court and Southern District of Texas. The trial court rescheduled the execution date, and the federal court dismissed for failure to exhaust state remedies. Anderson, represented by Alley, filed in the state trial court an amended application for writ of habeas corpus, alleging that he was denied effective assistance of counsel, particularly in Cannon's manner of conducting *voir dire* and in his failure to request a jury charge on voluntary manslaughter, and alleging that there was insufficient evidence to support the jury's affirmative answers to Special Issues 1 and 3. The trial court conducted evidentiary hearings on March 5 and 9, 1987, on questions about Cannon's effectiveness. Anderson, Cannon, and others testified at these hearings and Anderson was represented at them by Alley. On April 3, 1987, the Texas trial court entered an order adopting the proposed findings of fact and conclusions of law of the State of Texas (the State). The court denied habeas corpus relief and left in place a previously ordered execution date of April 28, 1987. The Court of Criminal Appeals denied the application for a writ of habeas corpus and a stay of execution on April 24, 1987.[2]

On April 27, 1987, the federal district court granted a stay of execution, finding that Anderson's claim of ineffective assistance of counselSQespecially Cannon's failure to request a

_____

[2] Although the Court of Criminal Appeals' April 24 order denying habeas relief states that the state district court entered an order "finding no controverted, previously unresolved facts material to this cause, and recommending that all relief be denied," the record reflects that Judge Walker of the 185th Judicial District of Harris County signed and adopted the State's proposed findings of fact and conclusions of law on April 3.

5

charge on voluntary manslaughterSQwas not frivolous. On August 28, 1988, Anderson, now represented by new counsel, filed an amended petition, raising twenty-nine grounds for relief. The petition contained allegations not presented in the state proceedings, but the State has expressly waived the exhaustion requirement. *See Felder v. Estelle*, 693 F.2d 549 (5th Cir. 1982).

The district court denied the writ of habeas corpus and dismissed the cause with a written order on April 23, 1991. Anderson's motions for new trial and for relief from the judgment were denied, and the district court declined to issue a certificate of probable cause for appeal. Pursuant to instructions from this Court, however, the parties have presented full briefs and orally argued the merits of Anderson's 28 U.S.C. § 2254 petition.

## Discussion

Anderson raises four primary arguments in this appeal: (1) that the operation of the Texas capital sentencing statute in this case violated the Eighth and Fourteenth Amendments as construed in *Penry v. Lynaugh*, 109 S.Ct. 2934 (1989), because the jury was not permitted to consider and act upon mitigating evidence concerning his background and character; (2) that he was denied effective assistance of counsel; (3) that the trial court erred in failing to instruct the jury on voluntary manslaughter and failing to place upon the State the burden of negating the existence of sudden passion; and (4) that the capital murder provision of the Texas Penal Code is unconstitutionally vague. We address these arguments in turn.

I. *Penry* Claim

In *Penry*, the Supreme Court held that without appropriate instructions the Texas special issues did not permit the jury to fully consider and give effect to the mitigating evidence of Penry's mental retardation and childhood marked by abuse. Because this evidence had relevance to his moral culpability beyond the scope of the special issues, the jury was unable through its answers to express a "reasoned moral response" to the evidence. *Penry*, 109 S.Ct. at 2948.

Anderson contends that various traumatic and harmful experiences in his past[3] constitute relevant, mitigating circumstances that the jury was not able to consider in this case. Also, he argues, the jury was told that he had been in jail in Arkansas, but not that his prison record was exemplary. Finally, the jury was not told of the assertedly corrupt and brutal conditions in the Arkansas prison, a factor of alleged immediate relevance to his defense because it supposedly helps to explain his uncontrollable rage when confronted with Webster's threats to send him back to prison.

Anderson admits that he did not attempt to introduce any of this evidence at trial or tender it to the trial court. He argues

---

[3] Specifically, his brief points out that his father was an alcoholic and schizophrenic man who was institutionalized, and that his maternal grandfather, who acted as a parent for Anderson, died before his eyes when he was twelve years old. Anderson was raised, the brief notes, by a "religiously fanatic" grandmother who administered corporal punishment and provided no emotional support. The brief points out that Anderson's adolescence was spent in a reform school where he was subjected to physical and sexual abuse, and where he became addicted to drugs and alcohol.

7

that the jury was "preempted" from considering this evidence because the jury was empaneled with the mistaken view, created by the prosecutor's questions during *voir dire*, that the terms "deliberate" and "intentional" were equivalent. The apparent thrust of Anderson's argument is that, because the jury mistakenly believed that any evidence showing intentional conduct required an affirmative answer to Special Issue 1, it would have been pointless if not harmful for him to introduce evidence tending to show that his intentional conduct was less culpable because of the scarring experiences from his past. The district court relied on *King v. Lynaugh*, 868 F.2d 1400, 1402-03 (5th Cir.) (per curiam), *cert. denied*, 109 S.Ct. 1576 (1989), to hold that Anderson's failure to preserve error in the trial court constituted a procedural bar to consideration of his *Penry* claim, and that he had failed to demonstrate sufficient cause and prejudice to overcome the procedural bar.

Anderson's reliance on the alleged misstatements during *voir dire* makes it unclear whether he is truly raising a *Penry* claim, *i.e.*, whether he is contending that the force of the mitigating evidence was beyond the three special issues as they actually exist in article 37.071(b) or merely beyond the special issues as he claims was erroneously explained to the jury by the prosecutor. To the extent that it is the latter, his argument is in essence one of ineffective assistance of counsel, and we address it in Part II, *infra*. To the extent that it purports to raise a *Penry* claim, we agree with the district court that it is unavailing, although our reasoning differs somewhat.

8

In response to the district court's holding, Anderson points out that the Court of Criminal Appeals has held, on a question certified from this Court, that, in a case tried before *Penry*, a failure to anticipate the *Penry* holding by requesting a special instruction on mitigating evidence or objecting to the lack of such an instruction would not constitute a procedural bar. *Selvage v. Collins*, 816 S.W.2d 390, 392 (Tex. Crim. App. 1991) (per curiam); *see also Black v. State*, 816 S.W.2d 350, 367-74 (Tex. Crim. App. 1991) (Campbell, J., concurring). We further note that the state habeas court did not have the *Penry* claim before it and did not hold that it was barred as a matter of state law.[4]

The question here, however, is not merely the effect of Anderson's failure to make a contemporaneous objection or request an instruction, but the effect of his failure to present the mitigating evidence at all, either at the guilt/innocence or the punishment phase of his trial.[5] This Court has held that a

_____

[4]    Although a *Penry*-type claim was included in Anderson's first state application for a writ of habeas corpus, it was not in his amended application and thus was not addressed by the state district court in its order denying habeas relief.
        Nor was any *Penry* claim submitted or addressed on direct appeal.

[5]    In a memorandum filed long after oral argument addressing *Johnson v. Texas*, 113 S.Ct. 2658 (1993), Anderson asserts that the record does contain evidence of his intoxication and that this presents a *Penry* claim. We reject this contention for several reasons. First, it was not raised in either Anderson's original brief or in his reply brief (or even in oral argument) in this Court, and is hence waived. *See, e.g., FDIC v. Texarkana Nat. Bank*, 874 F.2d 264, 271 (5th Cir. 1989); *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 976 n.4 (5th Cir. 1993). Further, evidence of intoxication may be considered as favorable to a negative answer to both the first and the second punishment special issues, and hence is not *Penry* evidence. *See Nethery v. Collins*, 993 F.2d 1154, 1161 (5th Cir. 1993); *James v. Collins*,

9

petitioner cannot base a *Penry* claim on evidence that could have been, but was not, proffered at trial. *Barnard v. Collins*, 958 F.2d 634, 637 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 990 (1993); *Wilkerson v. Collins*, 950 F.2d 1054 at 1061 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 3035 (1993); *May v. Collins*, 904 F.2d 228, 232 (5th Cir. 1990) (per curiam), *cert. denied*, 111 S.Ct. 770 (1991); *DeLuna v. Lynaugh*, 890 F.2d 720, 722 (5th Cir. 1989). Therefore, without regard to any state procedural default,[6] Anderson lacks a valid federal *Penry* claim.[7]

---

987 F.2d 1116, 1121 (5th Cir. 1993); *Cordova v. Collins*, 953 F.2d 167, 170 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 959 (1992). Moreover, there is no evidence that Anderson was intoxicated at the time of the offense, only his testimony that he went to the lounge to have a couple of drinks before asking Webster for the money, that he ordered "the drink" when he initially entered the lounge and had a beer after Webster closed the lounge, and the testimony of an officer, *outside* the presence of the jury, that he smelled alcohol on Anderson's breath when he was arrested. There was also evidence that empty beer bottles were in Anderson's truck when he was arrested, but no evidence of when they had been emptied or by whom. *See Drew v. Collins*, 964 F.2d 411, 420 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 3044 (1993). In *Jurek v. Texas*, 96 S.Ct. 2950, 2954 (1976), the Court noted that the evidence established that the defendant "had been drinking beer in the afternoon" of the offense (the opinion of the Texas Court of Criminal Appeals says the defendant committed the offense "after spending the late afternoon drinking beer," *Jurek v. State*, 522 S.W.2d 934, 937 (Tex. Crim. App. 1975)).

[6]     We note that the Texas Court of Criminal Appeals has also distinguished a petitioner's failure to present evidence at trial from a mere failure to request an instruction, suggesting that the *Selvage* holding may not encompass the former situation. *See Ex parte Goodman*, 816 S.W.2d 383, 386 n.6 (Tex. Crim. App. 1991); *Ex parte Ellis*, 810 S.W.2d 208, 212 n.6 (Tex. Crim. App. 1991); *see also Cordova v. Collins*, 953 F.2d 167, 174-75 (5th Cir. 1992).

[7]     We do not suggest that, had the circumstances to which Anderson refers been shown by evidence at trial, this would have required a *Penry*-type instruction, or that the failure to give such an instruction would not be a new rule for purposes of *Teague v. Lane*, 109 S.Ct. 1060 (1989). *See Graham v. Collins*,

II.  Ineffective Assistance of Counsel

To establish that his legal representation at trial or at a capital sentencing proceeding fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in *Strickland v. Washington*, 104 S.Ct. 2052 (1984).  He must show that his counsel's performance was both deficient (*i.e.*, that counsel did not provide reasonably effective assistance under prevailing professional norms, *id*. at 2064-65) and prejudicial *(i.e.*, that errors by counsel "actually had an adverse effect on the defense," *id*. at 2067).  The former component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 2065 (quoting *Michel v. Louisiana*, 76 S.Ct. 158, 164 (1955)).  On the latter component, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding"; rather, he must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 2067, 2068.

Much of Anderson's argument to this Court consists of generalized allegations about Cannon's reputation in the Harris County legal community for incompetence in capital cases.  With the aid of supporting affidavits from other attorneys, Anderson seeks

---

113 S.Ct. 892 (1993); *Johnson v. Texas*, 113 S.Ct. 2658 (1993).

to establish that Cannon habitually tries capital cases in a perfunctory manner. Both prongs of the *Strickland* test, however, require examination of the specific conduct and decisions made by counsel in the particular case; Anderson cannot establish that the representation he received was constitutionally inadequate merely from evidence about Cannon's reputation or conduct in other cases.

Anderson also refers to a number of more specific asserted failures by Cannon that we must assess under the *Strickland* guidelines.

A. *Failure to object to prosecutor's equation of "deliberate" with "intentional" during voir dire*

Anderson claims that Cannon erred in failing to object during *voir dire* to the prosecutor's mischaracterizations of the term "deliberate" as used in Special Issue 1. Anderson contends that the prosecutor wrongly stated to the prospective jurors that "intentional" and "deliberate" were synonymous, and that Cannon not only failed to object or request a corrective instruction from the court, but actually compounded the problem by agreeing with the misstatements. This error was prejudicial, he argues, because once the jury found him guilty of an intentional killing, they felt compelled, without a meaningful reconsideration of the evidence, to answer Special Issue 1 affirmatively.[8]

---

[8]    The Texas Court of Criminal Appeals has stated:

    "A capital venireman who cannot distinguish between an 'intentional' and a 'deliberate' killing has demonstrated an impairment in his ability meaningfully to reconsider guilt evidence in the particular context of special issue one. Absent rehabilitation, that venireman should be excused upon challenge for cause." *Martinez v. State*, 763 S.W.2d 413, 419 (Tex. Crim. App.

12

The *voir dire* transcripts, however, reveal that the prosecutor said that there were no official definitions for the terms used in the special issues, and typically[9] said that "deliberate" could be understood to mean "something along the lines of willful." He also said that the *evidence* adduced during the guilt/innocence phase to show that Anderson intentionally killed Webster would be the same evidence that would help the juror decide whether Anderson acted deliberately. For the last five empaneled jurors (Jurors Cole, Sebastian, Rieger, Walker, and Figg), the prosecutor varied his formula somewhat, saying that a common-sense definition of "deliberate" would be something like willful *or* intentional. Cannon did not object or return to the issue in his *voir dire* examination of these five jurors. The allegation that Cannon agreed with the prosecutor's statement is based on Cannon's statement to one juror regarding Special Issue 3. Cannon stated that while he agreed with nearly everything else that the prosecutor had said during *voir dire*, he disagreed with the prosecutor's comments about Special Issue 3.

Although there might have been room for an objection or clarification by Cannon in these five instances, we cannot say that the failure to make such an objection was either so deficient or so prejudicial as to approach the standards of *Strickland*. The

1988).

[9] *Voir dire* examination was conducted with each prospective juror individually, out of the presence of the other members of the venire panel. Therefore, any alleged misstatement by the prosecutor during *voir dire* would have affected only that particular venireman, and could be prejudicial only if he or she was in fact chosen for the jury.

13

prosecutor did not actually equate the standard of Special Issue 1 with the requisite *mens rea* for murder. *Strickland* requires us to ask "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 104 S.Ct. at 2069. In the present, we cannot find a reasonable probability either that these five jurors were given an erroneous view of the law by these passing remarks during *voir dire*, or, even assuming they were given an erroneous view, that without such a mistaken impression they would have concluded that Anderson had not acted deliberately. The question of deliberateness was hardly at issue in this case, in which Anderson stabbed Webster fifteen times; Cannon's closing argument to the jury in the sentencing proceeding focused solely on Special Issue 3. *See Landry v. Lynaugh*, 844 F.2d 1117, 1120 (5th Cir. 1988), *cert. denied*, 109 S.Ct. 248 (1988).

B.    *Failure to object to improper hypothetical questions during voir dire and to the prosecutor's contention that self-defense was not a defense to a capital murder charge*

Anderson contends that the prosecutor gave prospective jurors misleading hypothetical examples, and that Cannon failed to object or correct the jurors' resulting misunderstanding. The hypothetical examples were efforts by the prosecutor to explain the purpose of Special Issue 3. Because the *voir dire* to the first accepted jurorSQJuror Connally, who became the foremanSQis representative and is also the subject of some particular challenges by Anderson, it will be described in some detail.

The prosecutor posited for Connally a situation in which the

14

defendant went into a bank with a loaded gun to rob it, and the teller pulled her own gun to defend herself. The prosecutor explained that if the defendant then shot and killed the teller, he would not be able to resist a murder conviction by claiming self-defense, because he was responsible for the teller's action. Special Issue 3, the prosecutor explained, was the Legislature's attempt to deal with that type of situation by giving the jury a way to express its view that, although the defendant could not claim innocence by relying on self-defense, the fact that he was in fear of being killed himself when he acted might mitigate the appropriate punishment.

After posing a second, similar hypothetical case, the prosecutor then suggested that Special Issue 3 might or might not come into play in situations such as the first hypothetical illustration. Cannon immediately objected. After being told to rephrase his "question," the prosecutor told the juror that although Special Issue 3 would be given to the jury any time the deceased did anything that could remotely be considered provocation, and the fact that it was presented did not mean that it was applicable. He suggested that "[a]ll somebody has to do [to get Special Issue 3 included] is utter the magic word." Cannon again immediately objected, stating that "[t]he Legislature put it there and it is part of the law and deserves a serious consideration." His objection was sustained.

When the prosecutor passed Connally to Cannon, Cannon stated that he disagreed strenuously with the prosecutor's comments about Special Issue 3. After reiterating that the Legislature put

15

Special Issue 3 there and intended it to be taken seriously, Cannon

engaged in the following exchange with Connally:

> "Q  Can you conceive in your own mind of a hypothetical
>     case where that issue would definitely be raised?
> A   No.
> Q   You cannot conceive of any situation where
>     number three would apply?
> A   No, sir.  My feeling in this would be that, first of all,
>     the individual, as the act occurred, it was one illegal
>     act on top of another, and what right did he have to take
>     a life?
> Q   They are not saying there that he had the right to take
>     a life there.
> A   Was his actions unreasonable.
> Q   They are asking you in response to the provocation, if
>     any, by the deceased.
> A   That is like asking us if I was a prisoner of war, would
>     I try to escape.
> Q   Obviously, you would.
> A   You are right.
> Q   Let me put it this way, sir.  Let me give you a
>     hypothetical, a little different from the District
>     Attorney's.  By the way, I did understand you to say that
>     you could see in his hypothetical case, which was way
>     far-fetched that your response was reasonable, that the
>     robber's response was reasonable to the provocation.  Did
>     I understand that correct, Captain?
> A   Based on the example that the district attorney gave,
>     certainly, the fact that he gave, certainly."

Cannon then gave a hypothetical case basically the same as the

first one given by the prosecution, *i.e.*, the one about the bank

robber, and asked Connally whether the robber's response was

reasonable.  The State objected, and the court overruled the

objection.  Connally then indicated that in that situation he could

probably come up with a "no" answer to Special Issue 3.  Cannon

asked him if he could follow the law in that respect, and he said

that he felt sure that he could.[10]

---

[10]  Anderson charges that Cannon erred in accepting the seating
of Connally despite Connally's view that he could not conceive of
any situation in which Special Issue 3 would apply. As the above
summary indicates, if Connally did say that initially (and it is

16

After Connally, the prosecutor settled into a routine of giving jurors a hypothetical case in which a bank robber takes his wife and son with him to the bank, leaves them behind in his haste to escape from the bank, and then as he is leaving sees the bank teller about to kill his wife, and turns and shoots the teller. In most instances the prosecutor either implied that the answer to Special Issue 3 would be "no" under those circumstances, or did not imply anything one way or another. Cannon objected only once to the prosecutor's Special Issue 3 discussion after Connally: when the prosecutor suggested that if the evidence showed a reasonable response to provocation, the jury had *discretion* to mitigate punishment.

Cannon's approach was simply to ask the jurors whether they could envision a case in which they would answer Special Issue 3 "no." If they said that they would have difficulty envisioning such a case, he gave an example of someone who robs a convenience store, and as he is leaving the clerk draws a gun and begins firing on him, and the robber turns around and kills the clerk. Through this process, seven of the other eleven jurors expressly stated that they could envision a case in which they would answer Special Issue 3 "no."

Anderson makes several contentions regarding this *voir dire* activity. First, he argues that the facts of the hypothetical cases did not even constitute capital murder, but instead would more properly have been classified as cases of negligent homicide

---

not entirely clear that he did), he ultimately retreated from that position.

17

or voluntary or involuntary manslaughter. His point is evidently that the hypothetical cases infected the guilt/innocence phase of the trial by giving the jurors a misleadingly low understanding of the *mens rea* required for murder. This argument is misplaced, because none of the hypothetical cases involved accidental killings; in all of them the accused pointed his gun at the defendant and pulled the trigger with intent to kill. They would at least arguably have been capital murder.[11] Moreover, it is inconceivable that these examples, given during *voir dire* to illustrate the operation of Special Issue 3, resulted in any appreciable prejudice to Anderson in the guilt/innocence phase of the trial. The jury was fully and accurately instructed on the elements of capital murder at trial.

Anderson also argues that Cannon permitted the prosecutor to tell jurors, and indeed told jurors himself, that there was no such thing as self-defense to capital murder. He argues that this characterization ensured an affirmative answer to Special Issue 3, regardless of the evidence. Although both the prosecutor and Cannon made rather blanket statements to that effect, the statements were made in the context of the hypothetical cases discussed above, for which they were probably accurate.[12] More

---

[11] We therefore also reject his related argument that the *voir dire* illustrations prejudiced him in the sentencing phase by creating the impression that Special Issue 3 could be answered "no" only in circumstances that were not even capital murder.

[12] *See Harris v. State*, 784 S.W.2d 5, 10 (Tex. Crim. App. 1989) (capital murder defendant was not entitled to instruction on voluntary manslaughter based on his efforts to defend himself from the deceased where the defendant initiated the entire criminal episode by breaking into the deceased's house and

18

important, they were intended to explain why Special Issue 3 exists and show that under certain circumstances it *should* be answered negatively despite proof of capital murder.

Finally, Anderson makes a somewhat separate argument regarding *voir dire*.  He contends that Cannon permitted the prosecutor to give a legally erroneous explanation of Special Issue 2 that ensured an affirmative answer.  Specifically, Anderson alleges that the prosecutor created the impression that such innocuous conduct as stealing a paper clip or pinching a person could satisfy Special Issue 2's reference to future "criminal acts of violence."  A statement representative of what the prosecutor said in this respect is the following:

> "Criminal acts of violence.  If I went over and stole the Court Reporter's machine, that would be violence towards property.  If I went over there and punched her,[13] that would be a criminal act of violence toward person.  And there are varying degrees from punching someone to murder or stealing a paper clip to stealing someone's automobile or Rolls Royce."

Again, it is simply not plausible that Anderson was in any way prejudiced by any misstatement of law contained in these comments. Anderson admitted to having killed Webster in brutal fashion, and it is inconceivable that the jury answered Special Issue 2 affirmatively based on a belief that Anderson was a threat to commit petty crimes against property in the future.

---

attempting to kidnap his girlfriend), *cert. denied*, 110 S.Ct. 1837 (1990).

[13]     Presumably this is where Anderson's reference to "pinching" comes from.

*C.*     *Failure to request a charge on voluntary manslaughter,*
         *temporary insanity, or legality of the initial stop*

Anderson contends that Cannon rendered ineffective assistance by failing to request jury instructions on three theories, which he argues were presented by the evidence.

On the first theorySQvoluntary manslaughterSQthe State responds that Anderson's own account of events refutes the suggestion that a rational trier of fact could have convicted him of voluntary manslaughter.[14]  Voluntary manslaughter is murder committed "under the *immediate influence* of sudden passion arising from an *adequate* cause."  Tex. Penal Code Ann. § 19.04(a) (Vernon 1989) (emphasis added).   However, when Webster first committed the acts now questionably alleged to constitute adequate causeSQaccusing Anderson of rape and threatening to send him to prisonSQAnderson calmed himself sufficiently to persuade Webster to leave with him and to drive to the building where he was staying.   We agree with the State that in all likelihood under these facts Cannon could not even have gotten the issue of voluntary manslaughter submitted to the jury had he requested such an instruction.  *See, e.g., Cantu v. Collins*, 967 F.2d 1006, 1014 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 3045 (1993); *Luck v. State*, 588 S.W.2d 371, 375 (Tex. Crim. App. 1979), *cert. denied*, 100 S.Ct. 2171 (1980); *Harris v. State*, 784 S.W.2d 5, 10 (Tex. Crim. App. 1989), *cert. denied*,

_____

[14]    The jury was charged on the offense of murder, so the due process concerns in putting the defendant in a position where the jury can only convict of capital murder or acquit altogether, *see Beck v. Alabama*, 100 S.Ct. 2382 (1980), are not present here. *Montoya v. Collins*, 955 F.2d 279, 285 (5th Cir.),  *cert. denied*, 113 S.Ct. 820 (1992).

110 S.Ct. 1837 (1990).[15]  However, even assuming he could have gotten an instruction, Anderson has not shown that Cannon's representation was deficient under *Strickland*.  The State furnished to the state habeas court an affidavit from Cannon dated February 24, 1987, stating that he had not pursued the voluntary manslaughter defense because he thought it would strain the defense's credibility, making the jury likely to respond negatively in the punishment phase and jeopardize what he regarded as his primary avenue of defense, *viz.*, that the State had failed to prove the underlying robbery necessary for a capital murder conviction. Based on this affidavit and on Cannon's testimony at the hearing, the state court found that "[d]efense counsel's failure to request a charge on the lesser included offense of voluntary manslaughter was a conscious decision based on trial strategy."  Absent one of the eight statutorily designated exceptionsSQnone of which are alleged hereSQfactual determinations by the state court are entitled to a presumption of correctness.  28 U.S.C. § 2254(d); *Burden v. Zant*, 111 S.Ct. 862, 864 (1991) (per curiam).  Anderson has not made an adequate showing to overcome this presumption, and under the principles of *Strickland* we will not second-guess this aspect of Cannon's trial strategy.[16]

---

[15]  Anderson's reliance on *Hernandez v. State*, 742 S.W.2d 841, 843 (Tex. App.SQCorpus Christi 1987, no petition), is misplaced, as that case deals with involuntary manslaughter.

[16]  As previously observed (note 14, *supra*), a charge was given on the lesser included offense of murder.  We note that the Texas courts have consistently held that it is not error to fail to charge on a lesser included offense where no request for such a charge is made.  *See, e.g., Boles v. State*, 598 S.W.2d 274, 278 (Tex. Crim. App. 1980); *Hanner v. State*, 572 S.W.2d 702, 707

The second theory on which Anderson claims Cannon should have sought an instructionSQtemporary insanitySQis not raised by the evidence in the case. Anderson cites his testimony at trial that when he went to the lounge where Webster worked "my intention was to go in and have a couple of drinks," and evidence that empty beer bottles were in his truck when he was arrested. See also note 5, *supra*. This testimony does not even remotely form the predicate for a temporary insanity instruction or establish incompetence of counsel in failing to request one.

On the third theorySQlegality of the highway stop by StoneSQCannon did indeed challenge the initial stop at trial. Stone's testimony was initially given out of the jury's presence. Cannon then argued to the court that Stone had lacked probable cause for the stop because he had not observed Anderson committing any traffic violation, and that therefore the evidence found in the back of Anderson's truck was inadmissible. The trial judge overruled Cannon's objection. This issue was among those raised by Cannon on direct appeal and rejected by the Court of Criminal Appeals. *See Anderson*, 701 S.W.2d at 873. Having had his objection overruled by the trial court and having preserved the point for appeal, it is not clear what type of jury instruction Cannon could have sought, or how the legality of the initial stop

(Tex. Crim. App. 1978), *cert. denied*, 99 S.Ct. 1504 (1979); *Green v. State*, 533 S.W.2d 769, 771 (Tex. Crim. App. 1976); *Lerma v. State*, 632 S.W.2d 893, 895 (Tex. App.SQCorpus Christi 1982, pet. ref'd). Hence, it could not be ineffective assistance of counsel on appeal to fail to complain of the absence of an instruction on the lesser offense of voluntary manslaughter (even had that been raised by the evidence) as no request for an instruction on voluntary manslaughter had been made at trial.

could have been further challenged.

*D.    Failure to investigate and present various types of evidence*

Anderson contends that Cannon failed to develop various types of evidence that would have been valuable to his defense, including (1) expert evidence of Anderson's typically nonviolent temperament, raising the inference that Webster's killing was performed under the influence of a sudden passion or temporary insanity, (2) Anderson's exemplary behavior in prison, (3) character evidence from relatives to be presented during the sentencing phase, (4) evidence from patrons of Webster's club corroborating her reputation for assaultive conduct and involvement in drug activities, (5) evidence of Anderson's and Webster's business and sexual relationship, and (6) evidence of Anderson's family history and emotional disturbance.

Most of these matters were addressed in the state habeas hearing. Cannon testified, for instance, that he had Anderson examined by an independent psychiatrist to assess his sanity and ability to testify. This psychiatrist testified at the hearing that he diagnosed Anderson as having a sociopathic personality, and that he told Cannon that psychiatric expert testimony would not assist Anderson's defense in any way. Upon being appointed by the court, Cannon sent Anderson a form letter asking for the names of any witnesses that might be helpful. In his affidavit and oral testimony, Cannon testified that despite Anderson's failure to provide any names, Cannon contacted Anderson's mother as a potential character witness, but elected not to use her after she told him that she regarded her son's trial as the Lord's vengeance.

23

The habeas court accepted Cannon's testimony that he did not regard it as worthwhile to try to contact Anderson's father as a character witness, since except for one short visit Anderson had not seen him in over fifteen years. The court also found that Cannon concluded that testimony from Anderson's uncle and cousin would not help the defense strategy, since according to the prosecutor's file both were cooperating with the police. Although Anderson included as an exhibit to his federal habeas petition a form signed by his uncle indicating that he would be glad to appear as a character witness for Anderson, the form does not indicate in any way the substance of the testimony and provides no basis for concluding that Anderson was prejudiced by its absence. Without a description of the subject matter of the potential testimony, Anderson has not raised a cognizable claim under *Strickland*. *See Alexander v. McCotter*, 775 F.2d 595, 602-03 (5th Cir. 1985).

Likewise, for the issues that are not addressed by the state habeas court's findings, Anderson again makes only brief and conclusory allegations that Cannon's representation was deficient because of his failure to investigate and develop useful evidence. Typically, he does not specify what this investigation would have divulged or why it would have been likely to make any difference in his trial or sentencing (*e.g.*, "Mr. Cannon failed to investigate, develop and present evidence of the decedent's business relationship with the drug suppliers."). As the Seventh Circuit recently noted, without a specific, affirmative showing of what the missing evidence or testimony would have been, "a habeas court cannot even begin to apply *Strickland*'s standards" because "it is

24

very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance." *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991), *cert. denied*, 112 S.Ct. 1230 (1992). The evidence about which Anderson gives the most detailed description is his participation in a work program for death row inmates beginning in 1984. Because this evidence relates to conduct after the trial, Cannon cannot be deemed delinquent for failing to investigate and present it for mitigation in sentencing.

*E.   Allowing Anderson to testify*

Cannon is also alleged to have seriously erred in permitting Anderson to testify, because it allowed the introduction of the fact that he had previously been convicted of robbery and kidnapping in Arkansas, thus buttressing the State's robbery case. (Cannon inquired about these convictions in Anderson's direct examination to prevent them from being elicited for the first time by the State on cross-examination.)

The state habeas court found that Cannon fully explained to Anderson the advantages and disadvantages of testifying, and that Anderson himself made the decision to testify. Given the heavy reliance that the defense was placing on Webster's behavior toward Anderson on the night of her death, we cannot say that this was an unreasonable trial strategy. Anderson's testimony was the only way to introduce evidence of Webster's alleged attempt to blackmail him with a false charge of rape, on which the defense hinged its hopes for a negative answer to Special Issue 3.

25

III. Constitutionality of the Texas Capital Murder Statute

Anderson finally mounts a challenge to the constitutionality of the Tex. Penal Code Ann. § 19.03(a)(2), which states that a person commits capital murder if he "intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson." Anderson contends that the failure to define the phrase "in the course of committing . . . robbery" render the provision unconstitutionally vague. He relies on *Walton v. Arizona*, 110 S.Ct. 3047 (1990), for the proposition that such vagueness is impermissible as an aggravating circumstance used to a impose a death sentence, unless courts apply a limiting construction.

Anderson's argument, or one close to it, appears to have been rejected by this Court in *Fierro v. Lynaugh*, 879 F.2d 1276, 1278 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 1537 (1990). However, because Anderson relies on the subsequent *Walton* decision, and in order to cover any possible difference between Anderson's contention and the one rejected in *Fierro*, we will consider his argument.

In *Walton*, the Supreme Court confronted the Arizona sentencing scheme, which requires a sentencing determination by the court alone after a capital murder conviction. The court is to decide the existence or nonexistence of various aggravating and mitigating circumstances, including whether the offense was especially heinous, cruel, or depraved. The defendant claimed that the sentencer's discretion was not channeled as required by the Eighth and Fourteenth Amendments, relying on *Maynard v. Cartwright*, 108

26

S.Ct. 1853 (1988), and *Godfrey v. Georgia*, 100 S.Ct. 1759 (1980), in which the Court had declared similarly broad factors invalid. The Court found the Arizona situation distinguishable, because sentencing was by the trial judge, who could be presumed to know the law, rather than by a jury that was given only the bare statutory language, and because the appellate courts could make independent determinations of whether such an aggravating circumstance was met. *Id*. at 3057.

The phrase "in the course of committing . . . robbery" is, of course, not technically an "aggravating circumstance," but rather an element of the substantive offense. However, this distinction is perhaps not constitutionally significant in light of the Supreme Court's statements that designating aggravating circumstances and restricting the categories of murder for which death may be imposed serve, in the statutes of different states, the equivalent function of narrowing the class of persons eligible for the death penalty. *See Lowenfield v. Phelps*, 108 S.Ct. 546, 554-55 (1988). The Supreme Court relied on this narrowing at the guilt/innocence phase in upholding the Texas capital sentencing scheme. *See Jurek v. Texas*, 96 S.Ct. 2950, 2955-56 (1976) (plurality opinion).

The most important distinction between this case and *Walton* (or, more accurately, between this case and *Maynard* and *Godfrey*) is that both the nature of the phrase and the practice of Texas courts prevent the jury from being given unbridled discretion. Whereas in *Godfrey* the Georgia Supreme Court had affirmed a death sentence based on no more than a finding that the offense was "outrageously or wantonly vile, horrible or inhuman," and, in the words of the

27

United States Supreme Court, there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not," *Godfrey*, 100 S.Ct. at 1767, there *are* principled ways to distinguish applications of section 19.03(a)(2). To a much greater degree than words such as "outrageous," "wanton," "vile," or "inhuman," the phrase "in the course of committing . . . robbery" is grounded in the objective proof of the particular case; it does not appeal to the sensibilities of the jurors or invite imposition of a subjective standard. A robbery, as defined in the statute, must have been committed or attempted, and the murder must have had some temporal proximity and factual connection to the robbery. The only real room for uncertainty is how far one can expand the temporal proximity if the logical connection exists. For instance, could the killing of someone who locates the hiding bank robbers three days after the event be so considered?

This is the sort of question that might (at a stretch) be left open on the face of section 19.03(a)(2) alone. However, questions like this are ones that can readily be, and in fact have been, resolved by judicial construction[17] or by definitions elsewhere in the Penal Code, and thereafter applied in a manner leaving very little discretion. Section 29.01(1) defines "In the course of

---

[17] It was critical to the Court's decisions in *Godfrey* and *Maynard* that, even if the statutory terms *could* have been subjected to a limiting definition (*e.g.*, by looking to more objective factors, such as the use of torture, defined as serious physical abuse of the victim before death, *see Godfrey*, 100 S.Ct. at 1766), the highest courts of the two states had not done so. *Walton*, 110 S.Ct. at 3057.

28

committing theft" to mean "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." The Texas Court of Criminal Appeals has deemed this definition applicable to section 19.03(a)(2) as well, *Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980), and Anderson's jury was given this definition word-for-word. So defined, section 19.03(a)(2) entails even less discretion and bears little resemblance at all to the statutes at issue in *Maynard* and *Godfrey*. We therefore hold that Anderson's constitutional challenge is without merit.

## Conclusion

All of Anderson's contentions are unavailing, and we affirm the judgment of the district court denying habeas relief.[18]

AFFIRMED

---

[18] While we now seriously doubt that Anderson has even made the requisite showing for a certificate of probable cause, see *Black v. Collins*, 962 F.2d 394, 398 (5th Cir.), *cert. denied*, 112 S.Ct. 2983 (1992), the case has been fully briefed and orally argued on the merits in this Court, and so we elect to grant the certificate of probable cause as its denial now would serve no good purpose.

We deny Anderson's motion for stay of execution as well as his motion for oral argument thereon.