Norman Evans GREEN, Petitioner–Appellant,

v.

Gary L. JOHNSON, Director, Texas Department of Criminal Justice Institutional Division, Respondent–Appellee.

No. 98–50065.

United States Court of Appeals,
Fifth Circuit.

Nov. 11, 1998.

John F. Carroll, Leon, Amberson & Carroll, San Antonio, TX, for Petitioner–Appellant.

Gena A. Blount, Asst. Atty. Gen., Austin, TX, for Respondent–Appellee.

Before DAVIS, JONES and BARKSDALE, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Petitioner Norman Evans Green appeals from the judgment of the district court denying him a certificate of probable cause ("CPC"). Because Green has not made a substantial showing of the denial of a federal right, we affirm. In doing so, we acknowledge the district court's excellent opinion in this case, which should have apprised Green that his arguments are unmeritorious.

## I. Background

In 1985, Green was convicted of capital murder and sentenced to death for killing Timothy Adams by gunshot while in the course of attempting to commit a robbery. The Texas Court of Criminal Appeals reversed Green's conviction and remanded the case for a new trial. *See Green v. State,* 764 S.W.2d 242 (Tex.Crim.App.1989). In 1990, a jury once again convicted Green of capital murder and sentenced him to death. Green's conviction and sentence were affirmed by the Texas Court of Criminal Appeals. *See Green v. State,* 840 S.W.2d 394 (Tex.Crim.App.1992). The United States Supreme Court denied his petition for certiorari. *See Green v. Texas,* 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993).

In August 1993, Green filed an application for writ of habeas corpus in state court, followed by a supplemental application in October 1993. The state district court held an· evidentiary hearing on Green's habeas application, and it issued a recommendation that his application be denied. In July 1994, the Texas Court of Criminal Appeals denied Green's application for a writ of habeas corpus. The United States Supreme Court denied his petition for certiorari. *See Green v.*

*Texas,* 513 U.S. 1026, 115 S.Ct. 599, 130 L.Ed.2d 510 (1994).

State and federal habeas proceedings ensued. Notably, Green filed a 149–page petition for federal habeas relief. After voluminous briefing had been received, the district court issued a 198–page Memorandum Opinion and Order denying Green's petition for habeas corpus, denying Green's request for an evidentiary hearing, denying a CPC, and vacating the stay of execution. Green filed a timely notice of appeal on January 9, 1998.

Green's execution was subsequently scheduled for March 12, 1998. This court stayed Green's execution pending review of his application for a CPC.

In the early afternoon of February 13, 1985, Green and Harold Bowens visited a Dyer Electronics store in San Antonio, Texas. They did not purchase any merchandise, but rather cased the store and departed. Later that same afternoon, Green and Bowens returned to the store. This time, however, they attempted to rob the business which was then being tended alone by an eighteen-year-old clerk, Timothy Adams. Shots were heard emanating from the store by witnesses in the surrounding businesses, and Green and Bowens were seen fleeing the store by numerous eye-witnesses, one of whom told the jury that one of the suspects appeared to conceal something as he fled. Green and Bowens subsequently abandoned their car when stopped by the police, fled on foot, and although ultimately evading arrest, officers found the gun used to kill Adams in the vicinity of where Green had been chased on foot.

Adams, who was shot three times and fatally wounded, stated to numerous witnesses at the scene of the crime that he was shot by two black men who unsuccessfully tried to rob the store. Leslie Daniels, Dyer's city manager, spoke to Adams, who told him that two black men who had been in the store earlier that day had done this to him and that Gerry Rickhoff, Adam's supervisor, would know who they were as Rickoff was there when the two men made their first visit to the store. Rickhoff identified those two men as Green and Bowens. Green's fingerprints were the only identifiable fingerprints on the gun. A police fingerprint expert testified that the prints he found on the gun were inconsistent with the weapon having been wiped clean of prints. The bullets had been manually altered with an "X" cut into the nose of each bullet in order to facilitate a more rapid and deadly expansion upon impact. Dr. Robert Bux, who performed the autopsy on Adams, testified that the nature of Adam's wounds indicated both that Adams was in a defensive position when shot and that the victim was probably either bent over steeply or squatting down. One of Green's fellow inmates, Billy Hazel, testified that Green confessed to killing Adams as part of an attempted robbery.

A more detailed statement of the facts in this case is contained in *Green v. Texas,* 840 S.W.2d 394, 398–400 (Tex.Crim.App.1992). The best summary of the case, however, is provided in the district court's thorough opinion. The district court wrote:

> At trial, the evidence, viewed in the light most favorable to the prosecution, established that (1) the petitioner admitted to a cell mate in jail that he had shot Timothy Adams, (2) Adams had done nothing to provoke the shooting other than refusing to cooperate with a robbery attempt, (3) Adams was shot three times, once in the abdomen, once in the chest, and once in the arm, although the exact order of the wounds could not be determined, (4) both the shot which struck Adams in the chest and the shot which struck him in the abdomen each separately caused sufficient physical damage to prove fatal, (5) there was at least some pause between shots during the sequence of shots fired in the store, possibly between the second and third shots, (6) the bullets fired into Timothy Adams had been altered to make them more deadly than ordinary bullets of the same type, (7) the trajectory of the bullet wound in Timothy Adams' chest indicated that he was probably bent over at the time that the bullet entered his body, and (8) when confronted by the police, the petitioner successfully fled.

## II. Standard of Review

■ In an appeal from a request for habeas relief, this court reviews a district court's

factual findings for clear error and issues of law de novo. *See Moody v. Johnson,* 139 F.3d 477, 480 (5th Cir.1998).

■ After Green filed his application for a CPC, the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), changed the jurisdictional requirements for obtaining a CPC and now requires a petitioner to obtain a COA. *See* 28 U.S.C. 2253(c)(2). Because Green's federal habeas action was filed on December 5, 1994, before the effective date of AEDPA, the pre-AEDPA habeas standards apply to his appeal. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997). Generally, the standards for issuing a COA and a CPC are identical. *See Lucas v. Johnson,* 132 F.3d 1069 (5th Cir.1998). The district court denied Green a CPC.

■ A CPC is granted only if the defendant has made a substantial showing of the denial of a federal right. *See Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983); *Lucas,* 132 F.3d at 1073. The defendant must "demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot,* 103 S.Ct. at 3394 n. 4; *see also Lucas,* 132 F.3d at 1073.

### III. Conflict of Interest

■ As a preface to his brief on the merits, Green complains that the state trial court should have disqualified the Bexar County District Attorney's Office from representing the state during his state habeas corpus proceeding. His theory of disqualification is that attorney Dennis McKnight, who had briefly served as one of Green's counsel during the pretrial phase of his original 1985 state trial, was now serving as an Assistant District Attorney for Bexar County. Green's contention is conclusional, as McKnight evidently played no role whatsoever in the state habeas proceeding. Green

thus asserts that the entire District Attorney's office should have been disqualified because of McKnight's mere presence. Like the district court, we find no constitutional infirmity. To the extent Green asserts disqualification based on state law, even if he is correct (which is dubious), an error of state law made in state habeas corpus proceedings does not furnish a basis for habeas corpus relief. *See Hallmark v. Johnson,* 118 F.3d 1073, 1080 (5th Cir.1997), *cert denied,* —— U.S. ——, 118 S.Ct. 576, 139 L.Ed.2d 415 (1997). Further, there is no basis for asserting an unconstitutional conflict of interest, as Green has failed to identify any specific facts indicating how he was denied a full and fair hearing on the merits of any of his claims for relief in the state habeas corpus proceedings. He has not alleged any involvement of McKnight that might have tainted those proceedings in any way.

### IV. Ineffective Assistance of Counsel

In the district court, Green made twenty-one assertions of ineffective assistance by his trial counsel. He has now narrowed down that list to thirteen. We will address Green's claim in four categories based on the phase of his trial in which they occurred: (a) voir dire, (b) guilt/innocence phase, (c) punishment phase, and (d) direct appeal.

■ To assert a successful ineffectiveness claim, petitioner is required to establish both (1) constitutionally deficient performance by his counsel and (2) actual prejudice as a result of his counsel's deficient performance. *See Moody,* 139 F.3d at 482 (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). The failure to prove either deficient performance or actual prejudice forecloses an ineffective assistance claim. *See id.* at 483. In order to satisfy the first prong of the Strickland analysis, Green must prove that his counsel's performance "fell below an objective standard of reasonableness." *Strickland,* 104 S.Ct. at 2064.[1] The second prong of *Strickland* is satisfied if "there is a reasonable probability that, but for counsel's unpro-

---

1. Reviewing courts must give counsel's performance high deference. *See Strickland,* 104 S.Ct. at 2064–66. There is a strong presumption that counsel's performance fell within a wide range of

reasonable professional assistance. *See id.; Nichols v. Scott,* 69 F.3d 1255, 1284 (5th Cir. 1995); *Duff–Smith v. Collins,* 973 F.2d 1175, 1182 (5th Cir.1992).

fessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 2068; *see also Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) (stating that the prejudice prong of *Strickland* "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"). The determination whether counsel was constitutionally ineffective is a mixed question of law and fact that this court reviews de novo. *See Moody,* 139 F.3d at 483.

### A. Voir Dire

■ Green argues that his trial counsel rendered ineffective assistance during voir dire by failing to object to the prosecution's allegedly (1) obtaining commitments from prospective jurors regarding Green's guilt; (2) getting prospective jurors to commit that Green acted "deliberately" with respect to the first special issue on punishment; (3) getting prospective jurors to commit that Green posed a continuing threat to society; (4) making improper comments on Green's potential failure to testify; (5) giving an improper definition of the term "probability" in

relation to the second special issue on punishment; and (6) advising the prospective jurors that they were not responsible for imposing the death penalty.[2] Although this court's review of these complaints will reference Texas law, it is axiomatic that habeas relief is available only if Green is incarcerated in violation of his federal constitutional rights.

■ Green first argues that his counsel failed to object to the prosecution's allegedly asking hypothetical questions using facts exactly similar to his case in order to obtain commitments from prospective jurors regarding his guilt.[3] The record shows that the prosecution never asked prospective jurors a hypothetical question based on the specific facts of the case at hand, thereby "committing" them to find Green guilty. Rather, the prosecution properly limited itself to hypothetical questions regarding the application of general legal issues that would be involved in the case.[4] Specifically, the prosecution asked whether a juror could convict for capital murder if (i) the predicate felony was unsuccessful (*e.g.,* murder in the course of an unsuccessful burglary) or (ii) a defendant were an aider and abettor rather than the triggerman.[5] In both instances, the

2. Except in two instances, Green points to no record evidence for any of his contentions regarding ineffective assistance of counsel during voir dire. He fails both to cite to any portion of the record or to transcribe within his brief any allegedly suspect voir dire questions. It is not the job of an appellate court to go on a fishing expedition through the record to find facts favoring or disfavoring an appellant's arguments. Rather, it is the job of a party before this court to supply in its brief relevant record cites in order that this court may properly review his arguments.

Nonetheless, although Green provides no record cites, this court will review those portions of the record identified in the footnotes of the district court's Memorandum Opinion and Order. Because Green's arguments are largely frivolous, it would be futile and cause unnecessary delay to require new briefing.

3. Green makes two specific contentions: (i) the prosecution "committed" the jurors to find him guilty even if the predicate robbery was unsuccessful; and (ii) the prosecution "committed" the jurors to find him guilty if they found that he was only a party to the murder rather than the triggerman.

4. Under Texas law, when conducting voir dire, "it is proper to pose hypothetical fact situations to explain the application of the law, [but] it is improper to inquire how a veniremember would respond to particular circumstances." *Penry v. State,* 903 S.W.2d 715, 740 (Tex.Crim.App.1995) (citing *Cuevas v. State,* 742 S.W.2d 331, 336 n. 6 (Tex.Crim.App.1987)). In application, this means that "[a] proper [voir dire] question is one which seeks to discover a veniremember's views on an issue applicable to the case." *Rhoades v. Texas,* 934 S.W.2d 113, 122 (Tex.Crim.App.1996). In contrast, an improper voir dire question "attempts to commit a veniremember to a particular resolution based upon facts peculiar to the trial." *Id.* For instance, *Rhoades* held that it was improper to ask a prospective juror whether he *would* find good conduct in prison to be a mitigating factor, rather than whether he *could* find good conduct to be a mitigating factor. *See id.* at 123.

5. Under Texas law, an intentional murder committed "in the course of committing or attempting to commit" a predicate felony is capital murder if the murder occurs during an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the underlying predicate felony. *Mann v. Scott,* 41 F.3d 968, 977 (5th Cir.1994). Also, under

prosecution's statement of Texas law was substantially correct, and the jurors were asked general hypothetical questions not implicating the unique facts of the case at hand. Therefore, neither the prosecution's hypothetical questions nor its explanation of applicable Texas law was the basis for a valid objection. Because failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness, *see Sones v. Hargett,* 61 F.3d 410, 415 n. 5 (5th Cir.1995), Green has not established deficient performance. In addition, Green alleges no facts to show a reasonable probability that, but for counsel's failure to object, the outcome of his trial would have been different. Green's complaint fails both prongs of *Strickland.*

■ Green next argues that his counsel failed to object to the prosecution's using hypothetical questions allegedly to commit prospective jurors to find that Green acted "deliberately" in killing the victim. The first special issue at the punishment phase of a capital trial requires jurors to determine if the defendant acted "deliberately." The prosecution used hypothetical questions to determine if prospective jurors could distinguish between "deliberate" and "intentional" acts, which is a proper area for voir dire examination.[6] *See Heiselbetz v. State,* 906 S.W.2d 500, 509 (Tex.Crim.App.1995). As the district court found, the vast majority of the prosecution's questions did not require a prospective juror to commit that a specific set of facts constituted a "deliberate" act. Rather, each juror was questioned to determine if he could (not would) find that it was a "deliberate" act to wound a victim with the first shot and then shoot the victim additional times to prevent the victim from identifying his killer. And even in those rare instances where a juror agreed that a defendant acted

"deliberately" by shooting a victim multiple times, it is clear from the context of each question that the thrust of the prosecution's examination was to ensure that the juror could distinguish between "intentional" and "deliberate" acts. Thus, Green's counsel's failure to object does not violate the first prong of *Strickland* because it was perfectly reasonable not to object when the prosecution's evident purpose was to inquire into a valid area of voir dire examination. And even assuming there was deficient performance, Green fails to allege any facts showing prejudice. Under the circumstances of this case, there is no reasonable probability that, but for the failure of the petitioner's trial counsel to object to the prosecution's use of a hypothetical which involved multiple gun shots fired into a robbery victim to illustrate the difference between "intentional" and "deliberate" murder, the outcome of the petitioner's trial would have been different.

■ Green contends that his counsel failed to object when the prosecution allegedly committed jurors to give an affirmative answer to the second special issue on punishment regarding Green's "continuing threat to society."[7] Green had numerous previous convictions for property crimes, and he specifically alleges that the prosecution equated the term "criminal acts of violence" with "property crimes." Under Texas law, an error in voir dire occurs in connection with the second special sentencing issue when the prosecution attempts to limit the prospective jurors to its definition of "criminal acts of violence." *See Coble v. State,* 871 S.W.2d 192, 201 (Tex.Crim.App.1993). The record reveals no instance in which the prosecution "committed" any prospective juror to a specific definition a "criminal acts of violence."

Texas's "law of parties," a person charged as a principal with capital murder may be convicted on evidence showing only that he aided and abetted the commission of the offense. *See Montoya v. Scott,* 65 F.3d 405, 415 (5th Cir.1995).

6. Under Texas law, "there is a distinction between intentional and deliberate conduct; deliberate conduct is something more than intentional, but less than premeditation. We have repeatedly recognized that a venireperson who cannot distinguish between intentional and de-

liberate conduct is impaired in his ability to consider the first special issue, and is challengeable for cause." *Soria v. State,* 933 S.W.2d 46, 60–61 (Tex.Crim.App.1996) (internal citation omitted).

7. The second special issue at punishment instructs the jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" TEX. REV. STATS. ANN. art. 37.0711, § 3(b)(2) (Supp.1998).

Rather, the record shows that the prosecution sought to explain that "criminal acts of violence" need not be limited to acts against persons, but can include certain acts against property. Green cites no case law indicating that property crimes may not be considered as part of a jury's calculus in determining a defendant's future dangerousness. As a result, Green's counsel's failure to object to proper voir dire questioning neither was deficient nor prejudicial to petitioner under the two-prong test of *Strickland.*

 Green next argues that his counsel failed to object to the prosecution's allegedly improper comments on his right not to testify. First, we note that Green in fact testified during the guilt/innocence phase of his trial. Second, the district court correctly categorized the prosecution's comments as (1) "a simple declarative statement recognizing the defendant's constitutional right to remain silent," (2) "an effort to explain to the venire member in question that the prosecution cannot legally compel a criminal defendant to testify at trial," (3) "an effort to explain the nature of circumstantial evidence in the context of proof of a defendant's state of mind," and (4) "a recognition of the fact that eyewitnesses other than the defendant often do not exist in murder cases." Third, Green's counsel objected at least twice to the prosecutor's statements, and each time he was overruled.

 A prosecutor's statements regarding a defendant's failure to testify made *after* the introduction of evidence may violate the Fifth Amendment. *See United States v. Johnston,* 127 F.3d 380, 396 (5th Cir.1997). During voir dire, however, before the introduction of any evidence, the prosecution may attempt to determine if a prospective juror will be prejudiced against the state by the absence of live testimony from the defendant. *See Campos v. State,* 589 S.W.2d 424, 426 (Tex.Crim.App.1979) (stating that because the state's counsel had no way of knowing whether the defendant would testify, it was not necessarily error to comment on the de-

fendant's potential failure to testify during voir dire); *see also Sanders v. State,* 963 S.W.2d 184, 190 (Tex.App.Corpus Christi 1998, n.w.h.). This is a valid area of voir dire inquiry under Texas law as a prospective juror should be told what the law is before being excused for bias or prejudice against that law. *See Cuevas v. State,* 742 S.W.2d 331, 343 n. 12 (Tex.Crim.App.1987). Under *Strickland,* therefore, the failure of Green's counsel to object was not deficient because the prosecution's line of questioning was proper. Green alleges no facts suggesting that he was prejudiced.

 Green argues that his counsel failed to object to the prosecution's allegedly improperly defining "probability" as used in the context of the second special issue on punishment, thereby reducing the state's burden of proof. Green points to two specific statements made by the prosecutor.[8] Taken in context, this court agrees with the district court that the thrust of the prosecutor's explanations of "probability" was that the term meant more than a possibility but less than a certainty. *See Cuevas,* 742 S.W.2d at 347–38 (holding that it was not reversible error to refuse to grant a challenge for cause regarding a veniremember who stated that his understanding of the term "probability" was "somewhere between potential and likely"). In addition, Green counsel's objected once to the prosecution's attempts to define "probability," and he was overruled by the district court. Based on the foregoing, we cannot conclude that Greens' counsel's performance fell below an objective standard of reasonableness under *Strickland,* and Green fails to allege any facts showing prejudice.

Finally, in Green's last complaint regarding ineffective-ness during voir dire, he contends that the prosecution improperly advised prospective jurors that they were not responsible for imposing the death penalty. Green relies on *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) to make this claim, but the record

---

8. The prosecution used the following two examples:

 For example, if you are playing roulette. You've got all those numbers on the wheel and you throw the marble in there and you put your money down on a number. There is a probability that the marble will land on your number. It's not a certainty, of course, but it's more than a possibility. Because it's there on the wheel.

 If I hand you a deck of cards and ask you to pick one of 52 cards, there is a probability, again, albeit small, that you will pick the ace of spades.

evidences not even the slightest suggestion that prospective jurors could have been confused as to their responsibilities regarding the imposition of the death penalty. The district court's analysis of this issue is entirely correct. There is no violation of either prong of *Strickland.*

### B. Guilt/Innocence Phase

#### (1) Prosecution Witness Anton Michalec

Green argues that his counsel rendered ineffective assistance by failing to object to two specific portions of Officer Anton Michalec's testimony. Michalec, an officer with the San Antonio Police Department, served as the detective in charge of investigating Adams's murder.

First, Green objects to Michalec's alleged hearsay testimony that Bowens did not want to testify at Green's trial because he was afraid that by doing so something would happen to him at the penitentiary.[9] Green argues that Michalec's testimony left the impression in the jurors' minds that Bowens was afraid of retribution by Green which, in turn, impacted their deliberations on Green's future dangerousness during the punishment phase of trial. He also argues that because Bowens declined to testify, he had no opportunity to question Bowens before the jury about his refusal to testify.

Green alleges insufficient facts under the second prong of *Strickland* to show that he was prejudiced by his counsel's failure to object (more than once) to Michalec's testimony.[10] Bowens was eventually called to the stand by the defense, and in open court before the jury he refused to testify. The jury was free to disregard Michalec's testimony and draw its own conclusions regarding the reasons for Bowens's failure to testify based upon his appearance before them. In addition, it takes a large and unwarranted leap in reasoning to conclude from Michalec's testimony that Bowens was referring to a fear of Green. An equally plausible explanation for Bowens's comment is that he feared for his safety from other prisoners if they considered him a "snitch," and Green offers no facts to prove his gloss on Michalec's testimony. Finally, the evidence introduced during the guilt/innocence[11] and punishment[12] phases of Green's trial was so over-

9. Michalec's exact testimony, when on direct examination by the state, was as follows:

Q. And does he [Bowens] intend to testify in this case?
A. No, sir.
Q. And do you know why?
A. He said that he's afraid that when he is up there in the penitentiary that—
[Defense Counsel]: Your Honor, I have to object to anything he said as being hearsay.
[Judge]: Sustain the objection.
Q. Without going into what he said, do you know why?
A. He's scared for his life in the penitentiary; that if he testifies, they are going to do something to him.

10. Although we need not reach the issue, we agree with the district court's analysis and conclusion that Green's counsel's performance was not deficient under the first prong of *Strickland.*

11. The district court summarized the evidence from the guilt/innocence phase of Green's trial as follows:

[T]he petitioner admitted that (1) his criminal record included multiple convictions for auto theft and one burglary conviction, (2) he had received probated sentences in two of those cases, (3) on one occasion he had been arrested for unlawfully carrying a weapon following a traffic stop for running a red light, (4) his blood alcohol level at the time of that incident was 0.1, (5) he drove his vehicle to Dyer Electronics Store to assist Harold Bowens in the theft of some two hundred VCR's and himself was to receive ten VCR's, (6) when confronted by the police shortly after the shooting, he grabbed the murder weapon from the vehicle, ran away from the police, and during his flight discarded the gun in an apartment complex, (7) he had served two terms in prison prior to the date of the shooting of Timothy Adams, (8) he was arrested in Pennsylvania with a gun while he was on parole, and (9) when arrested in Pennsylvania, he gave the police a fictitious name that corresponded to the name on credit cards found in his possession.

12. The district court summarized the evidence introduced at the punishment phase of trial as follows:

(1) [P]etitioner had many problems while on parole and his parole was revoked in 1982, (2) petitioner was released from prison on mandatory supervision, a form of automatic release from custody, rather than on parole, which is discretionary with state parole officials, (3) on December 18, 1984, while released on mandatory supervision, petitioner violated the conditions of his release by leaving his halfway house without permission, carrying a gun, and leaving the State, (4) on January 1, 1985, petitioner was arrested in Pennsylvania for receiving stolen property and operating a vehicle without the possession of the owner and (a)

whelming as to his bad character and future dangerousness, that there is no possibility that absent Michalec's testimony the outcome of any portion of Green's trial would have been different. Therefore, Green's complaint fails the second prong of *Strickland.*

■ Second, Green objects to Michalec's testimony—while being cross-examined by Green's counsel—that Green refused to take a polygraph test.[13] Again, it is impossible to conclude that Green was in any way prejudiced by Michalec's testimony under the second prong of *Strickland.* Michalec's testimony reveals only that Green followed his counsel's advice not to take a polygraph test, not that Green himself refused to take the test. From Michalec's testimony, it appears that Green was willing to take the test. As the district court correctly concluded, "Given the overwhelming evidence of petitioner's guilt introduced at petitioner's second trial and the ambiguous nature of the information revealed by Detective Michalec, there is no reasonable probability that, but for the failure of petitioner's counsel to object to the testimony in question, the outcome of the petitioner's trial would have been different."

#### (2) Prosecution Witness Billy Hazel

■ Green argues that his counsel was ineffective for failing to object to the hearsay testimony of Billy Hazel, one of Bowens's

fellow inmates, who testified on the prosecution's re-direct examination that Bowens denied killing Adams. On re-cross, however, Green's counsel showed that Hazel was unaware that Bowens pleaded guilty to murdering Adams. In any event, given the overwhelming evidence of guilt presented in this case, there is no reasonable probability that but for Hazel's testimony the outcome of Green's trial would have been different. Green's complaint fails the second prong of *Strickland.*

#### C. Offer of Proof Regarding Harold Bowens's Testimony

■ Green argues that his counsel rendered ineffective assistance by failing to make an offer of proof after Bowens refused to testify at Green's second trial, thereby precluding Green from appealing this matter. Green argues to this court that Bowens's testimony would have been "easily impeachable and certainly not credible," thereby rendering "[h]is testimony beneficial to [Green because] the jury would have seen through his false accusation against [Green]." Beyond this, Green does not suggest what type of offer of proof his counsel should have made, nor does he offer any evidence to show how Bowens's testimony would have been favorable or helpful to him. And this is no wonder, because a review of Bowens's testi-

one of his companions was wounded by a gun the petitioner had sold to a third companion, (b) when arrested, the petitioner gave a false name, (c) the automobile in petitioner's possession at the time of that arrest had previously been reported stolen in Bexar County, Texas, (d) petitioner's two traveling companions were later sent back to North Carolina to face fraud charges, (e) ammunition was found inside the petitioner's brief case, and (f) petitioner was later indicted on auto theft charges in Bexar County as a result of that incident, (5) on January 5, 1977, plaintiff was arrested while driving a stolen vehicle which bore the stolen license plates from yet another vehicle, (6) on November 3, 1974, an officer arresting the petitioner interviewed the petitioner's grandmother and found that she was in fear of the petitioner, (7) on March 15, 1975, the petitioner fled from a uniformed police officer and violently resisted all efforts to arrest him for committing acts of vandalism at a church school, (8) on August 31, 1984, the petitioner ran a red light while driving a stolen vehicle bearing stolen license plates from yet another vehicle, refused to stop when police took up

pursuit, gave the pursuing officer a fictitious name once petitioner finally stopped, violently resisted the officer's efforts to arrest him, but eventually was subdued, arrested, and charged with aggravated assault on a police officer and auto theft, and (9) petitioner's reputation in the community for being peaceful and law-abiding was bad.

13. Green's counsel questioned Michalec as follows:

Q. Now, Detective, is that the only time you saw Norman Green, while he was in your office in that period of time?
A. Yes, sir.
Q. Like within that two weeks?
A. Yes, sir. Well, no. I went back to the jail one more time. He told me he was going to take a polygraph test. His court-appointed attorney a couple of days later, when it was time for him to take the test suggested he shouldn't take it.
Q. His attorney told him not to, so he followed his attorney's advice, is that correct?
A. Yes, sir.

mony for the prosecution at Green's first trial reveals a highly damaging story against Green.[14] Because conclusory assertions of prejudice are insufficient to satisfy the second prong of *Strickland, see Kinnamon v. Scott,* 40 F.3d 731, 735 (5th Cir.1994), Green's complaint fails.

## D. Punishment Phase

### (1) Green's Prior Residence on Death Row

■■■ Green argues that his counsel rendered ineffective assistance by failing to object to prosecution witness Richard Balanger's testimony on re-direct examination that Green had previously been a resident of death row. Balanger was an assistant warden at the Texas Department of Criminal Justice's Ellis I Unit. As the testimony shows,[15] the prosecution did not elicit the testimony in question from Balanger until after Green's own counsel had revealed that Green had been supervised by death row officers at Huntsville's Ellis I Unit. The prosecution did nothing but clarify what Green's counsel had already revealed to the jury. Therefore, Green's counsel's performance was not deficient under the first prong of *Strickland* because there was no legitimate basis for an objection. In addition, Green was in no way prejudiced by Balanger's testimony because his counsel's obvious strategy was to portray Green as a cooperative inmate even on death row, thereby mollifying the jury's opinion of Green's future dangerousness. The guilt/innocence phase of Green's trial had already found him guilty of murder, and the question before the jury was now whether to sentence Green to death. Green's counsel's attempt to show Green as a model death row prisoner cannot have prejudiced his case to such an extent that, but for

14. The district court summarized Bowens's testimony from Green's first trial as follows:

> A review of Bowens' testimony from the punishment phase of the petitioner's first trial reveals that Bowens practically buried the petitioner at that trial by testifying that (1) he had met Green three weeks before the shooting, (2) on February 13, 1985, he and Green spoke for about an hour and a half, (3) they then left in Green's car to go rob the Dyer Electronics Store in question, (4) it was Green's idea to rob the store, (5) Green had been to the store previously and had planned the robbery, (6) Green knew that the store manager would leave [the] store and planned to rob the place when the salesman was alone, (7) Green carried the gun and Bowens did not carry a weapon into the store, (8) Green drove to the store and they went in but they left after about fifteen minutes, (9) Green then drove around the block to the apartment complex behind the store to check out the back door of the store as a possible escape route during the robbery, (10) after about ten minutes behind the store, Green drove back around to see if the store manager had left, (11) even though they saw the store manager go back inside the store, they went back in when he left the scene, (12) Green pulled the gun on Timothy Adams, cocked the gun as if to strike Adams with it, and the gun went off, striking Adams in the fingers, (13) Adams then twice begged "please don't shoot me," (14) but Green shot Adams a second time, after which Adams said "you shot me, nigger," and Green then shot Adams a third time, (15) Green never gave Adams an opportunity to give them any money before shooting Adams, (16) Adams never did anything to threaten Green and never gave Green any reason to shoot him, (17) Green then di-

> rected Bowens to get the money out of the cash register but Bowens glanced briefly at the register and, because Bowens did not [know] how to open the register, he fled toward the door, (18) Green returned the gun to his waistband and got to the door before Bowens, (19) as they reached the door, Bowens told Green to slow down and they got into Green's car and drove away, (20) afterwards, Green was angry at Bowens and Bowens was afraid of Green, (21) Green threatened to kill Bowens or to have someone do something to Bowens' family if Bowens ever told anyone what had happened....

15. The exchange is question occurred as follows, beginning with the cross-examination of Balanger by Green's counsel:

> Q. And isn't it true that also this paper that you have used to refresh your memory states that [Green] was not a trouble maker and remembered him as being a cooperative inmate?
> A. Yes, it is.
> Q. What is a D.R. Security Officer, for the benefit of the jury.
> A. D.R. Security Officer is a Death Row Security Officer.
> Q. They stated he was not a trouble maker and remember him being a cooperative inmate; is that correct?
> A. Uh-huh.
> [Green's counsel]: Thank you, sir.
> REDIRECT EXAMINATION ON BEHALF OF THE STATE
> Q. So Officer—I'm sorry, Warden, the defendant has been on death row?
> A. Yes. He has been.
> · [State's counsel]: I have nothing further.

Balanger's testimony, the outcome of the punishment phase of Green's trial would have been different. Therefore, Green's complaint also fails the second prong of *Strickland.*

### (2) Prosecution's Closing Argument

▮▮▮▮ Green argues that his counsel failed to object to three portions of the prosecution's closing argument which allegedly commented on the failure of Green to testify during the punishment phase. The prosecution stated that there had been no evidence introduced (1) to support negative answers to the special issue regarding punishment, (2) to show that Green did not commit the unadjudicated offenses that had been introduced, and (3) to show that Green did not act deliberately in committing the murder. First, none of the prosecution's comments expressly discussed Green's failure to testify. Green testified during the guilt/innocence phase of his trial, and, of course, that testimony was a before the jury in making its determinations regarding punishment. *See King v. State,* 953 S.W.2d 266, 272 (Tex.Crim.App.1997). Second, when the prosecution's comments are viewed in context, they neither manifest an intent to comment on the defendant's failure to testify nor would they have naturally and necessarily been interpreted by the jury as a comment on the defendant's failure to testify. *See Johnston,* 127 F.3d at 396. Third, commenting on the absence of specific evidence in the record does not constitute a comment on the defendant's failure to testify when witnesses other than the defendant could have testified to such information. *See Nichols v. Scott,* 69 F.3d 1255, 1284 (5th Cir.1995); *United States v. Fierro,* 38 F.3d 761, 772 (5th Cir.1994). For the foregoing reasons, Green's counsel did not render ineffective assistance under either prong of *Strickland* by failing to object to the prosecution's closing argument.

### (3) Responsibility for Imposing Death Penalty

▮▮▮▮ Green argues that his counsel rendered ineffective assistance by failing to object to the following statement by the prosecution during its closing argument:

> None of you probably knew anything about the way the death penalty is imposed when this started. That's why we spend—you remember, we talked to you, the first thing we did was direct your attention to the punishment phase, so you would know that your own personal feelings, that you don't sign that thing and say "death." You don't sign it and say "life." All you do is answer those questions honestly.

Green contends that this statement so diminished the jury's sense of responsibility for imposing the death penalty as to have violated *Caldwell v. Mississippi.* He is incorrect for the simple reason that the state trial court instructed the jury as follows:

> You are further instructed that if the jury returns an affirmative finding on each of the three Issues submitted, this Court shall sentence the defendant to death. If the jury returns a negative finding on any Issue submitted, the Court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

In light of this clear and precise instruction, there is no possibility that the prosecution's statement misled the jury regarding its ultimate responsibility for imposing the death penalty in violation of *Caldwell.* Therefore, Green's counsel did not render ineffective assistance under the first prong of *Strickland* by failing to object, and Green alleges no facts showing prejudice.

### E. Incomplete Record

▮▮▮▮ Finally, Green argues that his counsel rendered ineffective assistance by failing to ensure a complete record of the trial proceedings was made and preserved. A review of the record shows that the only omissions are (1) the testimony of Officer Michalec during the pretrial hearing on Green's motion to suppress his statement and (2) the bench conferences which occurred throughout the trial. Green alleges no facts showing how he was prejudiced by these omissions. Rather, he offers only the conclusory allegation that "significant proceedings affecting substantial rights of the accused have been lost forever." Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue. *See Kinnamon,* 40 F.3d at 735; *Anderson v. Collins,* 18 F.3d 1208, 1221 (5th

Cir.1994). Green's complaint fails the second prong of *Strickland.*

### F. Direct Appeal

Green argues that his counsel rendered ineffective assistance on the direct appeal of his state court conviction by failing to raise in that appeal all of the claims that were asserted by Green in his habeas corpus petition in federal district court. The only specific claim that Green discusses, however, is his counsel's failure to raise the issue of the incomplete record. As discussed in the previous section, the two (tiny) portions of the record missing on appeal are (1) the testimony of Officer Michalec during the pretrial hearing on Green's motion to suppress his statement and (2) the bench conferences which occurred throughout the trial. Green's entire argument to this court consists of the following sentence: "Had the fact that a complete record of all proceedings in the Trial Court was not available on appeal [been raised by my counsel,] it is likely that the result of the appeal would have been different."

Persons convicted of a crime are entitled to effective assistance of counsel in their first appeal of right. *See Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 834–35, 83 L.Ed.2d 821 (1985). Counsel's performance on appeal is judged under the two-prong *Strickland* test. *See Goodwin v. Johnson,* 132 F.3d 162, 170 (5th Cir.1998). On appeal, effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available. *See Evitts,* 105 S.Ct. at 835; *West v. Johnson,* 92 F.3d 1385, 1396 (5th Cir.1996). Rather, it means, as it does at trial, counsel performing in a reasonably effective manner. *See id.*

In order to demonstrate prejudice, a petitioner must show not only that had counsel acted in a different manner a new trial would have been granted, but also that, as a result of counsel's incompetence, the trial was rendered fundamentally unfair or unreliable. *See Lockhart,* 113 S.Ct. at 842. "[T]he presence or absence of prejudice, both with respect to claims of ineffective assistance of counsel at the trial and appellate levels, hinges upon the fairness of the trial and the reliability of the judgment of conviction resulting therefrom." *See Goodwin,* 132 F.3d at 174. In short, a petitioner cannot demonstrate prejudice by showing that, but for counsel's deficient performance, he would have been entitled to a new trial under state law. *See id.* Rather, a petitioner must also demonstrate that counsel's deficient performance rendered the result of his trial unreliable or the proceeding fundamentally unfair. *See id.* at 172–75. Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue. *See Kinnamon,* 40 F.3d at 735; *Anderson,* 18 F.3d at 1221. Because Green has alleged no specific facts to show that he was in any way prejudiced by his counsel's performance on direct appeal, his complaint fails the second prong of *Strickland.*

### V.

Next, Green argues that his constitutional rights were violated by the district court's failure to adequately define a number of operative terms in the jury instruction issued at the punishment phase of the trial. Green maintains that Texas's special issues function as aggravating circumstances to "circumscribe the class of person eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). Because, he contends, Texas's special issues are unconstitutionally vague and the district court failed to provide an adequate definition, the jury was left with unfettered discretion in imposing its sentence. Green concludes that his sentence was arbitrary and capricious and must be vacated.

We disagree. Green's position is far from novel. As the district court properly noted, this court has addressed essentially this same argument in previous cases. Where, as here, the constitutionally required narrowing function was performed at the guilt-innocence stage, further narrowing at the sentencing stage is not required. *See West v. Johnson,* 92 F.3d 1385, 1406 (5th Cir.1996); *Woods v. Johnson,* 75 F.3d 1017, 1033–34 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996).

## VI.

In two related claims for relief, Green argues that the jury was unable to give effect to mitigating evidence that might have supported the conclusion that he was not the triggerman in the murder of Timothy Adams. Relying on *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), Green concludes that this alleged error violated the Eighth and Fourteenth Amendments.

For essentially the same reasons relied upon by the district court, we find Green's claim to be without merit. This court has construed the holding in *Penry* to require additional jury instructions *only* where the "major mitigating thrust of the evidence is beyond the scope of all the special issues." *Nethery v. Collins,* 993 F.2d 1154, 1161 (1993) (quoting *Graham v. Collins,* 950 F.2d 1009, 1027 (5th Cir.1992) (en banc), *aff'd,* 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993)). Moreover, Green "does not satisfy his burden of demonstrating a 'reasonable likelihood that the jury ... appli[ed] the challenged instructions in a way that prevent[ed] the consideration of constitutionally relevant evidence.'" *Stewart v. Collins,* 978 F.2d 199, 201 (5th Cir.1992) (quoting *Boyde,* 494 U.S. at 371, 110 S.Ct. at 1191). In this case, the jury had adequate opportunity to give effect to mitigating evidence that Green was not the triggerman. The district court adequately summarized:

> The state trial judge instructed the jury at the punishment phase of trial not only how it was to give mitigating effect to any evidence which the jury felt warranted a sentence of life imprisonment but also gave an "anti-law-of-parties" instruction advising the jury "you will consider only such evidence, if any, as you may believe relevant to the conduct, if any, of the defendant." [Green's] trial counsel argued that the evidence did *not* show that [Green] had been the triggerman and, therefore, the jury should return a negative answer to the first special issue sentencing issue.

The district court concluded, and we agree, that "[u]nder such circumstances, there is simply no reasonable likelihood that [Green's] jury applied the punishment phase jury instruction in a manner that prevented it from giving consideration to [his] evidence that he was *not* the triggerman."

## VII.

In two related claims for relief, Green contends that, because the Texas sentencing scheme does not require that the court inform the jury of the parole implications of a life sentence, his rights under the Fourteenth, Eighth, and Fifth Amendments were violated. We disagree.

Texas law does not confer a fundamental right to parole, *see Madison v. Parker,* 104 F.3d 765, 768 (5th Cir.1997), nor are capital defendants a suspect class, *see Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.1987). "When neither a fundamental right nor a suspect classification is implicated, a legislative classification is subject to review under the rational basis test to determine if the classification rationally promotes a legitimate governmental objective." *Smallwood v. Johnson,* 73 F.3d 1343, 1351 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 212, 136 L.Ed.2d 146 (1996). We agree with the district court's conclusion that a state may rationally conclude that its capital sentencing scheme would be better served by not requiring that courts inform juries of parole considerations:

> [I]nstructions on parole eligibility at the punishment phase of capital murder trials might tempt capital sentence juries to consider such transitory, but public, issues as prison overcrowding, the identities of the membership of the Texas Board of Pardons and Paroles, or the recent track record of that Board in releasing violent offenders, as factors which should be weighed in reaching their verdict at punishment.... The Texas legislature could rationally conclude that injection of parole issues at the punishment phases of capital murder trial would invite consideration of factors unrelated to the defendant's blameworthiness....

As a result, Green's claim for relief is without merit.

Moreover, Green's claim for relief under the Eighth and Fifth Amendment fails

as well. Relying on the Supreme Court's opinion in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), Green maintains that by failing to inform the jury of his parole eligibility, there is no guarantee that his sentence was not arbitrarily imposed.[16] For the reasons relied upon by the district court, *Simmons* does not apply:

> First, the Supreme Court took great pains in its opinion in *Simmons* to distinguish states such as Texas, which does not provide capital sentencing juries with an option of life without parole, from the scheme in South Carolina which required an instruction on parole ineligibility. Second, the Fifth Circuit has repeatedly refused to extend the rule in *Simmons* beyond those situations in which a capital murder defendant is statutorily ineligible for parole. At the time of [Greens's] trial, a Texas capital murder defendant who received a life sentence was ineligible for parole until he had served twenty years in prison.... [Finally] application of the rule in Simmons in [Green's] case would violate the *Teague* doctrine's prohibition on retroactive application of a new constitutional rule of criminal procedure.

Based on the foregoing, Green's claim for relief is without merit.

### VIII.

Green contends that the trial court erred in overruling objections during voir dire that the state was improperly commenting on his right not to testify. For the reasons given earlier, *see supra* Part III.A., Green's claim fails.

### IX.

■ Green next contends that he is entitled to a new trial because no record was either made or preserved at various stages of the pretrial hearing on a motion to suppress or the bench conferences during trial. Insofar as Green relies on Texas Rules of Appellate Procedure to furnish a basis for habeas relief, he is in error. *See West v. Johnson,* 92 F.3d 1385, 1404 (5th Cir.1996). Moreover,

barring a showing that the alleged violation resulted in "actual prejudice," *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993), habeas relief is unwarranted. Because Green has failed to assert specific facts explaining why the alleged error prejudiced the outcome of his trial, his claim is without merit.

### X.

■ Green contends that the trial court erred in refusing to grant counsel's motion to withdraw. We disagree. Green does not enjoy a constitutional right to the counsel of his choice. *See United States v. Breeland,* 53 F.3d 100, 106 n. 11 (5th Cir.1995). More important, however, we have already found Green's *Strickland* claims to be without merit. Thus, any suggestion that the denial of counsel's motion to withdraw led to ineffective representation fails.

### XI.

■ Next, Green contends that his constitutional rights under the Sixth and Fourteenth Amendments were violated when his involuntary statement was entered into evidence. Without any specific allegations explaining why his statement was involuntary, he has failed to raise an issue of constitutional import. *See United States v. Pineda,* 988 F.2d 22, 23 (5th Cir.1993) (" '[M]ere conclusory allegations on a critical issue are insufficient to raise a constitutional issue'." (quoting *United States v. Woods,* 870 F.2d 285, 288 n. 3 (5th Cir.1989))). Moreover, we agree with the district court's conclusion that implicit in the trial court's denial of Green's motion to suppress is the finding that the statement was made voluntarily. As a federal court in a habeas proceeding, we "are required to grant a presumption of correctness to a state court's explicit and implicit findings of fact if supported by the record." *Loyd v. Smith,* 899 F.2d 1416, 1425 (5th Cir.1990). Finally, we agree with the district court—for the reasons explained in its opinion—that the state court record fairly sup-

---

**16.** Although this issue is easily disposed of on the merits, we also note that Green cannot get any relief from it because it would represent the impermissible retroactive application of a "new rule" of constitutional law. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

ports the implicit finding that Green's statement was voluntary. Thus, we conclude that he has failed to allege an error of constitutional dimension.

### XII.

■ Green contends that the trial court erred in denying his motion for a new trial based on an incident in which a woman contacted the jury foreman the evening before the final day of testimony in the punishment phase and offered her $1,000 not to appear in court the next day. Green concludes that denial of this motion deprived him of his constitutional rights under the Sixth and Fourteenth Amendments.

During the punishment phase, the burden is on the prisoner to prove that the jury contact "moved the jurors involved to be more harsh or more lenient." *Miller v. Estelle,* 677 F.2d 1080, 1086 (5th Cir.1982). In this case, the jury foreman notified the court immediately after she was contacted. The judge instructed her not to discuss the incident with her fellow jurors. During the last day of the punishment phase, the foreman noticed that the person who had contacted her was in the courtroom. She then passed a note informing the court.

Green has failed to provide affidavits from jury members or any other evidence supporting the conclusion that the deliberations were tainted by the outside contact with the jury foreman. Meanwhile, the prosecution gathered affidavits from each of the jurors stating that (1) he arrived at his verdict based solely on the evidence presented and the law given by the court, (2) there was no discussion of the efforts made to influence the jury foreman, (3) and no such discussion had taken place in their presence. As the district court correctly concluded, Green's "speculative ruminations regarding [the jury foreman's] subjective thought processes are insufficient to overcome the strength of the affidavits presented by the prosecution ... which establish that the contact had no impact on jury deliberations or the jury verdict at the punishment phase at trial." Based on the foregoing, Green's claim is without merit.

### XIII.

■ Without citation to any supporting cases, Green contends that the state court erred when it denied his motion for a life sentence after the jury notified the court that after less than six and one-half hours it was deadlocked.

"Because the trial judge 'is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination' of whether a deadlock exists, the judge's findings must be 'accorded great deference by a reviewing court.'" *Fay v. McCotter,* 765 F.2d 475, 477 (5th Cir.1985) (quoting *Arizona v. Washington,* 434 U.S. 497, 510 & n. 28, 98 S.Ct. 824, 832 & n. 28, 54 L.Ed.2d 717 (1978)). Moreover, because whether the jury is deadlocked is essentially a finding of fact, deference to the trial court is mandated in this habeas action by 28 U.S.C. § 2254(d). *See id.*

■ In light of the extensive evidence and mountain of testimony the jury had to consider, we agree with the district court's conclusion that the trial court did not err in finding that continued deliberations were appropriate under the circumstances. Thus, Green's claim is without merit.

### XIV.

■ Green argues that the evidence does not support the jury's affirmative answer to the first special issue during the punishment phase at trial. Specifically, he maintains that the evidence does not support the conclusion that he deliberately killed or attempted to kill Timothy Adams.

"Where a federal habeas corpus claimant alleges that his state conviction is unsupported by the evidence, federal courts must determine whether the conviction is unsupported by the evidence, ... by asking 'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lewis v. Jeffers,* 497 U.S. 764, 781, 110 S.Ct. 3092, 3102–03, 111 L.Ed.2d 606 (1990) (citations omitted) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

■ The evidence in this case supports the conclusion that any rational trier of fact could have found that Green was the trigger-

man and that he acted deliberately and with a reasonable expectation that death would result. The uncontroverted testimony at trial was that (1) after Timothy Adams was mortally shot, he stated that "they tried to rob me but they didn't get anything;" (2) Green was in the store when the murder occurred; (3) his fingerprints were found on the gun; (3) Adams was first shot in the hand, and then three more shots were fired at him; and (4) Green admitted to a cellmate that he killed Adams. Under Texas law, evidence that a person is armed while committing a crime has probative value in proving deliberate conduct. *See Cooks v. State*, 844 S.W.2d 697, 714 (Tex.Crim.App.1993). Although in some respects the evidence pointing to Green's guilt is either circumstantial or based on the credibility of various witnesses, this alone is insufficient to supplant the jury's determination. The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Based on the foregoing, Green's claim for relief is without merit.

### XV.

■■■ Next, Green contends that the evidence was insufficient to support the jury's finding that he would constitute a continuing threat to society. Under the standard enunciated in *Jackson*, this claim borders on the frivolous.

Given the heinous nature of this crime, not to mention Green's extensive criminal history as summarized by the district court, we have no trouble concluding that any rational jury could find that there was a probability that he would commit future acts of violence and would represent a continued threat to society. We see no need to expound further. Green's claim lacks even a patina of merit.

### XVI.

■■■ In his final claim for relief, Green argues that the trial court erred in when it overruled his hearsay objection to the testimony of Billy Hazel. Hazel, who shared a cell with Green, testified that Green told him that he shot Timothy Adams.

Evidentiary rulings are only reviewable on habeas to the extent the "trial judge's error is so extreme it constituted denial of fundamental fairness." *Mattheson v. King*, 751 F.2d 1432, 1445 (5th Cir.1985). Only where the error was "material in the sense [of being a] crucial, critical, or highly significant factor" will a petitioner be afforded habeas relief. The state court of criminal appeals found no evidentiary error in the admission of this testimony. Even assuming that the trial court committed error, however, the overwhelming weight of the evidence supported Green's conviction, and the admission of this testimony did not render the trial fundamentally unfair. Thus, we find Green's claim to be without merit.

### XVII. Hearing

■■■ It should be apparent from the preceding discussion that the district court did not err in denying Green a federal evidentiary hearing on his claims. In a pre-AEDPA federal habeas corpus action, a petitioner may receive an evidentiary hearing only where he has alleged facts which, if proved, would entitle him to relief, there is a genuine dispute concerning critical facts, and the petitioner did not receive a full and fair hearing in state court. *See Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir.1996). No hearing is necessary where the record is complete and the petitioner raises only legal claims that can be resolved without taking additional evidence. Green's allegations and arguments do not warrant an evidentiary Hearing.

### Conclusion

Green has received ample consideration in state and federal court of the numerous issues he asserted. After careful review, we have found no reversible error of fact or law in the district court's reasoning, and its judgement denying CPC relief is therefore AFFIRMED.

AFFIRMED.