**REVISED - September 18, 2001**

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 01-50238

_____

GERALD WAYNE TIGNER,

Petitioner - Appellant,

versus

JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent - Appellee.

Appeal from the United States District Court
for the Western District of Texas

August 28, 2001

Before EMILIO M. GARZA, STEWART, and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Gerald Wayne Tigner ("Tigner"), a death row inmate, seeks a certificate of appealability ("COA") to challenge the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. Tigner has failed to make a substantial showing of the denial of his constitutional rights because Supreme Court and Fifth Circuit precedents foreclose all of his arguments. We deny the COA.

The case arises from a violent and fatal altercation on a suburban street in Waco, Texas. While on bail for a separate murder indictment, Tigner was driving a truck with his friend Guan Scott ("Guan") and his brother, Timothy Scott. As Tigner drove down the street, he came upon a car being

driven by Michael Watkins ("Watkins") and James Williams ("Williams"). Tigner signaled for Watkins and Williams to turn around the block, which they did. Tigner and Guan got out of the truck and approached the car to talk to its occupants. For reasons unclear from the appellate record, the conversation turned for the worse. Tigner started yelling at Williams and then began shooting his gun into the car. As the car rolled away, Tigner walked alongside it and continued to fire his gun at Watkins and Williams.

When Tigner ran out of bullets, he went back to his truck to retrieve another gun and returned to the car. At this point, Watkins had fallen out of the car and was crawling away. As Watkins lay on the ground, Tigner shot him in the head. Tigner then fled the scene. Both Watkins and Williams died from the gunshot wounds. Watkins suffered ten gun shot wounds, including two to the head, while Williams had seven gun shot wounds, including four head wounds.

The next day, law enforcement officials arrested Tigner, who later confessed to the shootings. At trial, two eyewitnesses testified that Tigner was the gunman who shot Williams and Watkins. A jury convicted Tigner of murder. At the punishment phase of the trial, the state presented numerous witnesses, including a Special Crimes Unit officer who testified that Tigner had a "dangerous and violent" reputation, and a municipal court judge who said that Tigner had threatened to "get even with him later." Another state witness was Dr. James Grigson, a psychiatrist who testified that Tigner had an anti-social personality disorder and represented a continuing danger in the future. Tigner introduced his own witnesses as well, offering statements from his mother and grandmother. Ultimately, the jury sentenced Tigner to death, finding that he posed a future threat to society. Tigner unsuccessfully sought post-conviction relief from the state courts. He then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, which the federal district court denied.

A prisoner seeking review of a district court's denial of his habeas petition must first obtain a COA. In his petition for a COA, Tigner makes two arguments. First, he claims that the state trial court violated his Eighth and Fourteenth Amendment rights by refusing to tell the jury that he would have been ineligible for parole for 35 years had he been given a life sentence. Second, he argues that Dr. Grigson's testimony that he would pose a future threat to society deprived him of due process.

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") governs this case because Tigner filed his COA after AEDPA's effective date of April 24, 1996. *See Green v. Johnson*, 116 F.3d 1115, 1119-1120 (5th Cir. 1997). In determining whether to grant a COA, we must see if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Slack v. McDaniel*, 529 U.S. 473, 554,120 S. Ct. 1595, 1603, 146 L. Ed. 2d 542 (2000). To demonstrate a substantial showing of the denial of a constitutional right, a prisoner must show that the "issues are debatable among jurists of reason." *Hill v. Johnson*, 210 F.3d 481, 484 (5th Cir. 2000).

**I**

**A**

Tigner argues that the state trial court violated his Fourteenth Amendment due process rights by failing to instruct the jury that, if given a life sentence, he would not be eligible for parole for 35 years. At the time of his trial, Texas law barred judges from instructing juries on parole possibility in capital cases, but allowed such instructions in non-capital felony cases. Tigner claims that the information regarding his 35-year parole ineligibility was relevant to the jury's calculus of his potential future dangerousness: had the jurors known that he would remain incarcerated for at least 35 years, they might have opted to give him a life sentence instead of the death penalty.

Both the United States Supreme Court and the Fifth Circuit have already considered and rejected such a Fourteenth Amendment due process challenge. As a general rule, states have the freedom to formulate the type of jury instructions given in state trials. *See California v. Ramos*, 463 U.S. 992, 1000, 103 S. Ct. 3446,3452-3453, 77 L. Ed. 2d 1171 (1983) ("The deference we owe to the decisions of the state legislatures under our federal system . . . is enhanced where the specification of punishments is concerned, for 'these are peculiarly questions of legislative policy.'") (internal citations omitted). The Supreme Court, however, has carved a narrow exception to the presumption that states have wide discretion in the realm of jury instructions. *See Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d. 133 (1994). A state must give a jury instruction regarding parole ineligibility if (1) the state introduces the defendant's future dangerousness in asking for the death penalty, and (2) the alternative sentence to death is life without the possibility of parole. *See id.* at 168, 114 S. Ct. at 2196.

Contrary to Tigner's assertions, *Simmons* provides no support for his due process argument. In *Simmons*, the Supreme Court expressly held that its ruling does *not* apply to Texas, because it does not have a life-without-parole alternative to capital punishment. *See id.* at 168 n.8, 114 S. Ct. at 2196 (noting that Texas and North Carolina do not give juries information about parole status but explaining that they do not have life-without-parole alternatives). The harshest alternative to capital punishment in Texas is a life sentence without the possibility of parole for 40 years.[1] In other words, Tigner was not entitled to a jury instruction regarding his 35-year parole ineligibility, because only prisoners who face life sentences without any possibility of parole can demand a *Simmons* instruction.

_____

[1]     At the time of Tigner's conviction, Texas law provided that the alternative was a life sentence without the possibility of parole for 35 years.

The Supreme Court recently reiterated this point: "The parole-ineligibility instruction is required *only when*, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law." *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S. Ct. 2113, 2120, 147 L. Ed. 2d 125 (2000) (emphasis added).

Our Circuit has consistently emphasized that a defendant can receive a jury instruction regarding parole ineligibility only if there exists a life-without-possibility-of-parole alternative to the death penalty—an option not available under Texas law. *See, e.g., Wheat v. Johnson*, 238 F.3d 357 (5th Cir. 2001) (holding that a defendant was not entitled to a *Simmons* instruction because he faced an alternative sentence with the possibility of parole 40 years later). To the extent that Tigner claims that this court should nevertheless rule that he was entitled to a *Simmons* instruction, such an argument is barred by the *Teague* non-retroactivity principle. *See Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L.Ed. 2d 334 (1989) (holding that new rules of constitutional criminal law will not be announced or applied on collateral review). We have repeatedly held that an extension of the scope of *Simmons* will constitute a "new" rule under *Teague*. *See, e.g., Wheat*, 238 F.3d at 361-62.

**B**

Tigner also claims that the failure to give the jury instruction violated the Eighth Amendment's prohibition against cruel and unusual punishment. He correctly points out that the Supreme Court in *Simmons* declined to state whether the Eighth Amendment might compel a different result. *See Simmons*, 512 U.S. at 162, n.4, 114 S. Ct. at 2193. But the Fifth Circuit has held that neither the due process clause nor the Eighth Amendment requires a state court to give jury instructions regarding parole ineligibility in Texas. *See, e.g., Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995).

## C

Finally, Tigner maintains that Texas' sentencing scheme at the time of his conviction violated the Fourteenth Amendment's guarantee of equal protection, because it treated capital crime defendants differently from non-capital ones. Specifically, he contends that Texas law irrationally allowed non-capital defendants to receive jury instructions regarding parole ineligibility, while capital defendants could not demand such an instruction.[2] We have previously considered and rejected this equal protection argument. We apply a rational basis test in this case because it does not implicate a suspect classification or a fundamental right. *See Green v. Johnson*, 160 F.3d 1029, 1044 (5th Cir. 1998) (holding that Texas law does not confer a fundamental right to parole). Thus, under a rational basis test, we must uphold a governmental classification if it rationally promotes a legitimate government objective. *Id.*

We have held that a state could rationally conclude that juries should not consider parole ineligibility in capital cases only:

> Instructions on parole eligibility at the punishment phase of capital murder trials might tempt capital sentence juries to consider such transitory, but public, issues as prison overcrowding, the identities of the membership of the Texas Board of Pardons and Paroles, or the recent track record of that Board in releasing violent offenders, as factors which should be weighed in reaching their verdict at punishment. . . . The Texas legislature could rationally conclude that injection of parole issues at the punishment phase of capital murder trial would invite consideration of factors unrelated to the defendant's blameworthiness. . . .

*Id.* at 1044 (internal citations omitted). Tigner acknowledges that our Circuit has rejected an equal protection challenge to Texas' sentencing scheme, but he requests that we reconsider our decision.

---

[2] Texas has now amended the statute to allow a capital crime defendant to receive a jury instruction regarding his parole possibility. *See* TEX. CODE CRIM. PROC. art. 37.071(e)(2)(b) (2001).

One circuit panel cannot overrule another panel's decision. *See, e.g., Tucker v. Johnson*, 242 F.3d 617, 621 n.6 (5th Cir. 2001).

## II

Tigner constitutionally challenges the admission of Dr. James Grigson's expert testimony that he would be a future threat to society with little hope of rehabilitation. Dr. Grigson came to this conclusion without personally interviewing Tigner. This argument is procedurally barred for the failure to exhaust state remedies. *See* 28 U.S.C. § 2254(b). At his state trial, Tigner objected to Dr. Grigson's testimony on evidentiary grounds only, and not on constitutional grounds. We will not consider this constitutional challenge because it was not presented to the Texas Criminal Court of Criminal Appeals. *See Richardson v. Procunier*, 762 F.3d 429 (5th Cir. 1985) (requiring exhaustion at the highest state court).[3]

Even if Tigner had exhausted his state remedies, his constitutional objection to the admission of Dr. Grigson's testimony would fail because of *Teague*'s non-retroactivity principle. Tigner concedes that the Supreme Court has allowed the admission of expert psychiatric testimony even in a death penalty case, *see Barefoot v. Estelle*, 463 U.S. 880, 904, 103 S. Ct. 3383, 3401, 77 L.Ed. 2d. 1090 (1983), but he responds that the Court implicitly overruled *Barefoot* when it later issued its *Daubert* standard for the admission of scientific evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed. 2d 469 (1993). We decline Tigner's invitation to undercut

---

[3] The federal district court noted that Tigner had failed to exhaust his state remedies, but nevertheless addressed and rejected the argument on its merits. Although the district court considered this argument, we can *sua sponte* refuse to hear it for the lack of exhaustion. *See Graham v. Johnson*, 94 F.3d 958, 970 (5th Cir. 1996).

*Barefoot*, because to do so on collateral review would constitute a new rule in violation of *Teague*'s non-retroactivity principle.[4]

Tigner's application for a certificate of appealability is DENIED.

---

[4]    Judge Garza only reiterates his belief, as expressed in his special concurrence in *Flores v. Johnson,* that a psychiatrist who predicts a murderer's future dangerousness without examining him likely runs afoul of all five *Daubert* factors.  *See Flores v. Johnson*, 210 F.3d 456, 464-70 (5th Cir. 2000) (specially concurring, Garza, J.) (recognizing the "statutory right to impose death as an appropriate punishment" but also cautioning that "what separates the executioner from the murderer is the legal process by which the state ascertains and condemns those guilty of heinous crimes.").